Filed 12/12/23  P. v. Jackson CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAMESON WOLFGANG JACKSON,<br><br>        Defendant and Appellant. | A164600<br><br>(Mendocino County<br>Super. Ct. No.<br>SCUK-CRCR-2020-35868-1) |

Jameson Wolfgang Jackson (appellant) appeals his convictions, following a jury trial, for murder and attempted murder.  We affirm.

BACKGROUND

*Information*

In December 2020, appellant was charged by information with first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189), with allegations that the murder was perpetrated by firing from a motor vehicle (§ 190.2, subd. (a)(21)) and that appellant personally used a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).  Appellant was further charged with attempted

---

[1] All undesignated statutory references are to the Penal Code.

1

murder (§§ 187, subd. (a), 664), with an allegation that appellant personally used a firearm (§ 12022.53, subd. (c)).[2]

*Prosecution Case*

J.S. testified that in the summer of 2000 he borrowed a red Ford F-150 truck from friends.[3] On August 16, 2000, the truck was taken from J.S. by two strangers: appellant, armed with an axe, and Shayla Guerrero, armed with a knife. The following day, J.S. was with his brother when he saw appellant and Guerrero driving the red truck. The hood and roof had been painted black. J.S. and his brother followed them for a few minutes until they stopped. Appellant and Guerrero began moving items from a car into the truck. J.S. told his brother to go notify the local police, and J.S. stayed, telling appellant and Guerrero to return the truck. They refused.

J.S. called the police, telling the 911 operator, "They stole my car and they have it here, and they don't want to give it to me."[4] Appellant and Guerrero got back inside the red truck, and J.S. placed himself in front of it to prevent them from leaving. An acquaintance, Joel Mendoza-Gonzalez, joined J.S. Guerrero, who was driving, accelerated towards J.S. and Mendoza-Gonzalez and they ran to avoid being hit, with J.S. slightly ahead of Mendoza-Gonzalez. J.S. saw appellant pointing a gun at him from the passenger seat, then the truck ran into a nearby post and J.S. heard a gunshot. J.S. felt blood coming from his ear and saw Mendoza-Gonzalez lying on the ground. J.S. did not have a gun or any other weapon on the day of the shooting, and he did not see Mendoza-Gonzalez with a weapon.

---

[2] A third charge was dismissed by the People before trial.

[3] J.S. testified through an interpreter.

[4] A recording of the 911 call, which was partly in Spanish, was played for the jury and a transcript with English translation was provided.

2

A Spanish-speaking law enforcement officer who responded to the scene interviewed J.S. in Spanish. J.S. told the officer that Guerrero and appellant refused to return the truck, appellant was carrying a gun, and appellant and Guerrero drove towards J.S.

Alfredo M. was working nearby when he heard a car accelerating, a loud bang, and soon thereafter a shot.[5] A minute later, appellant ran by, firing a gun but the gun was jammed. A red Ford truck with a black top sped by, stopped near appellant, and then sped off with appellant.

A tribal police officer testified the red truck nearly collided with his unmarked patrol vehicle. The truck had damage to the front passenger side bumper and the front right tire appeared to be locked in place. The officer activated his vehicle lights and followed the truck. The truck stopped at a cemetery and Guerrero and appellant got out and fled.

Mendoza-Gonzalez died from a single gunshot wound to the head, with an entry wound slightly higher than the exit wound. Law enforcement did not find any empty casings at the scene of the shooting, but did find a bullet pushed into a casing, consistent with a gun having jammed. In the cemetery near the red truck abandoned by Guerrero and appellant, law enforcement found a magazine that matched the bullet found at the scene of the shooting. Inside the red truck was a can of black spray paint and the axe appellant was holding when he stole the truck from J.S.

*Defense Case*

Appellant testified in his own defense. In the early morning hours of August 16, 2020, he was with Guerrero in her car when a truck turned off its lights and began following them. The truck pulled ahead of them and

---

[5] Alfredo M. testified through an interpreter.

3

reversed, slamming into the front of their car. Guerrero was able to drive away, but when they stopped the car it would not start again. They stayed in the car that night.

The next day, a red and black Ford F-150 truck pulled onto the property where their car was stopped. J.S., whom appellant did not know, got out. Appellant and Guerrero approached J.S. and arranged to borrow his truck for 68 dollars, plus an additional 120 dollars later. They drove off in the borrowed truck. They returned the following morning, intending to move Guerrero's belongings from her car to the truck, take them to her mother's house, and then return the truck. J.S. and two other men, including Mendoza-Gonzalez, got out of a nearby white truck. While appellant moved Guerrero's belongings, Guerrero and J.S. began arguing.

The white truck was blocking the exit from the property. Appellant grew scared and he and Guerrero got into the red truck, with Guerrero driving. They were trying to find an alternate way off the property when appellant heard shots fired. As they continued to try to drive away, Guerrero ran into a post and the white truck that was blocking the exit. Appellant got out of the red truck, taking a loaded pistol he had found in the truck, and started to run. As he ran, the white truck pulled forward and hit him. Appellant fell into a fence, and as he got up he fired a shot into the windshield of the white truck because he was afraid for his life. He accidentally fired a second shot as he ran away, but then the gun jammed.

Guerrero picked up appellant in the red truck and they drove off. As they turned into a cemetery, a car followed them. Appellant thought the people in the car were intending to harm them, so when the red truck stopped appellant ran and hid in bushes. After his arrest, appellant told police he did

4

not have a gun on the day of the shooting. Appellant lied to the police because he did not want to get in trouble.

*Prosecution Rebuttal*

On rebuttal, the People called Guerrero. Guerrero was in custody and had her attorney present. Guerrero had entered into a plea agreement with the district attorney's office, whereby she pled guilty to unlawfully taking the truck and being an accessory after the fact, in exchange for her honest and truthful testimony.

On August 16, 2020, she and appellant took a Ford F-150 truck from J.S. Guerrero had a knife and appellant had an axe. The truck was red when they took it but later that day appellant spray painted parts of it black. On the morning of the following day, Guerrero and appellant returned to the location where they had taken the truck from J.S., to move Guerrero's belongings from her car into the truck. J.S. and others were there, but Guerrero did not see anyone with a firearm at that point. The others were arguing and had blocked the exit from the property. No one did anything threatening to Guerrero or appellant.

As Guerrero and appellant tried to drive the truck off the property, she saw appellant had a firearm. J.S. and two others were hiding behind a tree. Guerrero drove into a pole and then appellant fired two shots from inside the truck. One of the men lay on the ground and another ran while holding his hand against his head. Appellant got out of the truck and began running away. Guerrero drove after him and picked him up. As they drove away, Guerrero almost ran into another vehicle. She recognized the driver as a tribal police officer. She turned into a cemetery, and the officer followed them with his lights flashing. The red truck died and Guerrero and appellant fled on foot.

5

The People also presented evidence that appellant made a phone call during the trial in which appellant said his attorney was "talking about some self defense" strategy but he would "not say[] I shot anybody. You know? Cause I didn't."[6]

*Verdict and Sentence*

The jury found appellant guilty as charged and found true all allegations. The trial court sentenced appellant to life without parole, with an additional aggregate term of 32 years to life.

## DISCUSSION

I.   *Marsden[7] Motion*

Appellant argues the trial court abused its discretion in denying a posttrial *Marsden* motion. We reject the contention.

A.   *Additional Factual Background*

At a September 2021 posttrial hearing set for sentencing, appellant made a *Marsden* motion. At the *Marsden* hearing, appellant identified a number of concerns with trial counsel, including that she failed to obtain medical records which he claimed would have supported his self-defense claim.[8] Trial counsel stated she was aware of the records and intended to obtain them, but they "slipped my mind." She further stated, "the jurors had indicated after the trial that they would have liked to have seen the medical records to—to corroborate what [appellant] said about having been hit by the truck," and because "I missed what I now believe to be a rather important

---

[6] An audio recording of the call was played for the jury and a transcript was provided.

[7] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[8] At trial, appellant testified that after his arrest, he was sent to the hospital and had a CT scan and x-rays.

6

piece of evidence that I should have brought, I do think he has a colorable issue for a motion for a new trial based on my failure to bring in that piece of evidence." The trial court granted the *Marsden* motion and appointed substitute counsel, finding that, with respect to the medical records, appellant "was not properly represented and it is a colorable issue for a motion for a new trial."

In February 2022, at the new sentencing hearing, appellant again made a *Marsden* motion. At the *Marsden* hearing, appellant stated substitute counsel failed to obtain his medical records. Substitute counsel explained he had reviewed the trial transcripts, evidence, and discovery materials he received from trial counsel and had determined, "based on what I have reviewed," that a new trial motion would not be granted.

The trial court denied the motion. The court began, "Your trial testimony was that you were outside the vehicle at the time of the shooting and fired shots when the vehicle was trying to strike you. And those medical records would have corroborated your testimony that you were struck by a vehicle." The court then discussed evidence contradicting appellant's trial testimony, including Guerrero's testimony "that the gun was fired from inside the cab when she was in the vehicle with you" and that "the trajectory of the bullet" killing Mendoza-Gonzalez was "front to back, higher in the front, lower in the back, indicating that the shooter was hire [sic] than the victim at the time the victim was shot. Your version of events could not have produced that result with that gun." The court concluded, "I'm relying on [substitute counsel], his legal opinion is that even with those medical records, there was not a sufficient legal basis for a new trial motion. And the only . . . argument for incompetence is that he didn't review records that he believed were not going to change the outcome of any new trial motion. [¶] And so for those

7

reasons, I don't find that [substitute counsel] has fallen below any constitutional standard of representation in this matter . . . ." The court added that appellant had "not only appellate remedies but also habeas remedies. And those may be the proper remedy if you're looking for that kind of a remedy."

B.   *Legal Background*

" 'When, after trial, a defendant asks the trial court to appoint new counsel to prepare and present a motion for new trial on the ground of ineffective assistance of counsel, the court must conduct a hearing to explore the reasons underlying the request. [Citations.] If the claim of inadequacy relates to courtroom events that the trial court observed, the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant. [Citation.] If, on the other hand, the defendant's claim of inadequacy relates to matters that occurred outside the courtroom, and the defendant makes a "colorable claim" of inadequacy of counsel, then the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial.' " (*People v. Smith* (1993) 6 Cal.4th 684, 692–693 (*Smith*).)

"A defendant is entitled to competent representation at all times, including presentation of a new trial motion or motion to withdraw a plea. . . . [J]ustice is expedited when the issue of counsel's effectiveness can be resolved promptly at the trial level. In those cases in which counsel *was* ineffective, this is best determined early. Thus, when a defendant satisfies the trial court that adequate grounds exist, substitute counsel should be appointed. Substitute counsel could then investigate a possible motion to withdraw the plea or a motion for new trial based upon alleged ineffective assistance of counsel. Whether, after such appointment, any particular motion should

8

actually be made will, of course, be determined by the new attorney. [¶] We stress equally, however, that new counsel should not be appointed without a proper showing. A series of attorneys presenting groundless claims of incompetence at public expense, often causing delays to allow substitute counsel to become acquainted with the case, benefits no one. The court should deny a request for new counsel at any stage unless it is satisfied that the defendant has made the required showing. This lies within the exercise of the trial court's discretion, which will not be overturned on appeal absent a clear abuse of that discretion." (*Smith*, *supra*, 6 Cal.4th at pp. 695–696.) " 'Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel.' " (*Id.* at pp. 690–691.)

C.     *Analysis*

Appellant argues the trial court abused its discretion in finding substitute counsel provided adequate representation despite not obtaining appellant's medical records. Appellant contends substitute counsel's "failure to obtain the medical records is no different from trial counsel's initial failure to obtain the medical records," and since the trial court found the latter was inadequate representation, the former must also be. Appellant seeks a remand for new "appointed counsel to obtain the medical records, perform whatever necessary follow-up investigation those records suggest, and reach an informed decision as to whether to bring a new trial motion." Appellant argues the availability of habeas remedies are an insufficient alternative because he is indigent and has no right to appointed habeas counsel unless and until a prima facie case has been established.

The trial court did not abuse its discretion. First, appellant fails to cite authority supporting his implicit assertion that we are bound by the trial

9

court's inadequacy findings on the first posttrial *Marsden* motion when reviewing the court's denial of the second posttrial *Marsden* motion. Second, even so assuming, at the first *Marsden* motion, trial counsel opined that her failure to obtain the medical records could be a basis for a motion for new trial. At the second *Marsden* motion, substitute counsel opined, after reviewing the trial transcript, exhibits, and discovery, that whatever the medical records showed, a new trial motion would not be warranted. The trial court considered the evidence presented at trial—specifically, the significant evidence contradicting appellant's self-defense claim—and concluded that substitute counsel did not provide inadequate representation. The record before the trial court on the second *Marsden* motion was different than on the first motion, and the court did not abuse its discretion in reaching a different conclusion.

Finally, the trial court relied in part on the availability of appellate and habeas remedies. "Our cases explain that, in appropriate circumstances, the trial court should consider a claim of ineffective assistance of counsel in a motion for new trial, because '*justice is expedited* when the issue of counsel's effectiveness can be resolved promptly at the trial level.' " (*People v. Cornwell* (2005) 37 Cal.4th 50, 101, disapproved of on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.) However, trial courts may reasonably conclude that "justice would *not* be expedited by entertaining [a] defendant's [ineffective assistance of counsel] claim in a motion for new trial." (*Cornwell* at p. 101; see also *id.* at p. 102 [trial court did not abuse its discretion in denying *Marsden* motion on this ground].) Appellant's proceedings had already been delayed for nearly five months to allow substitute counsel time to review the records and determine whether grounds for a new trial motion were present. The court's determination that

proceedings should not be delayed for an *additional* five (or more) months to allow yet another attorney to conduct such a review, when appellate counsel would be reviewing the record in any event, was not an abuse of discretion.

We reject appellant's contention that his habeas remedies are insufficient because of his indigency. Appellant cites no authority that his lack of a right to appointed counsel to investigate a possible habeas petition renders that remedy unavailable. In any event, while appellant lacks the *right* to appointed counsel for such purposes, appointed counsel may nonetheless be available. "The courts of appeal have different policies on whether an appellate appointment includes filing a habeas petition." (Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2023) § 42.57.) "The agency which operates in this District is the First District Appellate Project (FDAP)." (*People v. Hackett* (1995) 36 Cal.App.4th 1297, 1311.) We take judicial notice of the following language on the FDAP website: "In the First Appellate District, the scope of a Court of Appeal appointment includes—*if warranted*—conducting a habeas investigation and filing a petition for a writ of habeas corpus petition in the Court of Appeal." (*Panel Attorney Policies & Procedures*, FDAP <https://www.fdap.org/panel-attorneys/policies-procedures/> [as of Dec. 12, 2023], italics added.) Notably, appellant's appellate counsel, appointed through FDAP, has not filed such a petition.

Appellant has failed to establish the trial court abused its discretion in denying his second posttrial *Marsden* motion.[9]

---

[9] We need not decide whether appellant's *Marsden* motion was also untimely, as the People contend.

11

II.    *CALCRIM No. 337*

Appellant argues the trial court prejudicially erred in instructing the jury, pursuant to CALCRIM No. 337, "When Shayla Guerrero testified, she was in custody.  The fact that a witness is in custody does not by itself make a witness more or less believable.  Evaluate the witness's testimony according to the instructions I have given you."  Appellant does not argue the instruction is a misstatement of law, but instead contends it precluded the jury from considering his defense theory that Guerrero was lying to gain favor with the district attorney, because her custodial status was part of her motivation.

"In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution.  [Citations.]  The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

The jury was instructed on evaluating witness credibility, pursuant to CALCRIM No. 226, to consider factors including, "Was the witness's testimony influenced by . . . a personal interest in how the case is decided?" and "Was the witness promised leniency in exchange for his or her testimony?"  The jury was also instructed, pursuant to CALCRIM No. 316, "If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony."  Moreover, "CALCRIM No. 337 expressly limits its application to the jury's consideration of the custodial *status* of a witness, without reference to the *conduct* underlying the custody."  (*People v. Mackey* (2015)

233 Cal.App.4th 32, 115 [rejecting claim that instruction patterned on CALCRIM No. 337 precluded jury from considering defense theory that in-custody accomplice's testimony was not credible].) "Under these circumstances, there is no reasonable possibility that the jury understood CALCRIM No. 337 to prevent or restrict it from applying CALCRIM No. 316" (*Mackey,* at p. 116) or CALCRIM No. 226 to consider Guerrero's agreement with the prosecution in evaluating her testimony.[10]

III.    *Self-Defense Instruction*

The trial court instructed the jury on self-defense pursuant to CALCRIM No. 505. Appellant argues the trial court erred in including the following portion of the instruction: "Defendant's belief [that there was an imminent danger of death or great bodily injury to himself] must have been reasonable and he must have acted only because of that belief." Appellant contends that, contrary to the instruction, when a defendant acts in self-defense in resisting an active attempt to murder or to do great bodily injury, the defendant's act can permissibly have been motivated by both fear *and other reasons.* (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1046 ["We note that defendant did not argue in the trial court, nor has he argued on appeal, that the jury should have been instructed that acting based on mixed motives is permissible so long as reasonable fear was the but-for cause of his decision to kill. We therefore have no occasion to consider whether such a rule would be consistent with section 198 as interpreted in [prior cases]."].)

We need not decide whether the instruction was error because any error was harmless beyond a reasonable doubt. Appellant argues he was prejudiced because the jury could have found "(1) [appellant] was indeed

---

[10] We therefore need not decide whether appellant forfeited the contention by failing to raise it below, as the People argue.

13

resisting an attempt to cause him great bodily injury, (2) he shot while that attempt was taking place but (3) [appellant's] decision to use deadly force was in some small part influenced by something other than fear," and rejected self-defense based on finding (3), even though under proper instructions "findings (1) and (2) should have been enough to rely on self-defense." Appellant's prejudice argument fails because a separate verdict shows the jury necessarily rejected findings (1) and (2).

The only evidence that appellant was resisting an attempt to cause him great bodily injury and shot while that attempt was taking place was appellant's testimony that he was outside the red Ford truck when J.S. and others drove into him, and he fired as he got up from his subsequent fall. However, the jury found true the drive-by special circumstance (§ 190.2, subd. (a)(21)), which required a finding that appellant "[shot] a firearm from a motor vehicle" when he killed Mendoza-Gonzalez. (See CALCRIM No. 735.) Thus, the jury necessarily found that appellant was inside a vehicle when he fired the shot that killed Mendoza-Gonzalez, and therefore could not have found that he was resisting an attempt to cause him great bodily injury at the time he shot Mendoza-Gonzalez. Any error in the self-defense instruction as to mixed motives was harmless.

IV.   *Juvenile Adjudication*

After appellant testified in his own defense, the parties stipulated to the facts of prior misconduct committed when appellant was 15 years old, to wit, an armed robbery with an accomplice, during which a victim was killed, resulting in a juvenile adjudication.

Appellant argues the use of a juvenile adjudication to impeach his testimony violated his constitutional rights. As appellant concedes, California caselaw is to the contrary. (*People v. Lee* (1994) 28 Cal.App.4th

14

1724, 1740 ["the prosecution may introduce prior conduct evincing moral turpitude even if such conduct was the subject of a juvenile adjudication, subject, of course, to the restrictions imposed under Evidence Code section 352 and other applicable evidentiary limitations"].) We need not decide whether, as appellant contends, United States Supreme Court cases require a different result, because appellant's stipulation to the evidence bars the challenge. " 'A binding stipulation admitting evidence may be made, even if such evidence is otherwise inadmissible.' " (*People v. Elder* (2017) 11 Cal.App.5th 123, 134.) "Having voluntarily entered into the stipulation, the doctrine of invited error precludes" a challenge on appeal. (*Ibid.*; see also *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 821–822 [" 'Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error.' "].) Accordingly, we reject the challenge.

V.    *Drive-By Special Circumstance*

Appellant argues the drive-by special circumstance statute (§ 190.2, subd. (a)(21)) violates the Eighth Amendment because it applies to every conviction for drive-by murder (§ 189, subd. (a)).

"The Eighth Amendment to the United States Constitution, which prohibits the infliction of 'cruel and unusual punishments,' imposes various restrictions on the use of the death penalty as a punishment for crime. One such restriction is that any legislative scheme defining criminal conduct for which death is the prescribed penalty must include some narrowing principle that channels jury discretion and provides a principled way to distinguish those cases in which the death penalty is imposed from the many cases in which it is not. A death-eligibility criterion that fails to meet this standard is

15

deemed impermissibly vague under the Eighth Amendment." (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 462 (*Bacigalupo*).)

Under the drive-by special circumstance, if the jury finds a first degree murder "was intentional and perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person or persons outside the vehicle with the intent to inflict death," the penalty "is death or imprisonment in the state prison for life without the possibility of parole." (§ 190.2, subd. (a)(21).)  First degree drive-by murder is "murder that is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death . . . ." (§ 189, subd. (a).)  Appellant argues that, because every drive-by murder is death-eligible under the drive-by special circumstance, the special circumstance is unconstitutional.

As appellant concedes, the argument was rejected in *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 164, which relied on *Lowenfield v. Phelps* (1988) 484 U.S. 231.  *Lowenfield* rejected an argument that a death sentence violated the Eighth Amendment because "the sole aggravating circumstance found by the jury at the sentencing phase was identical to an element of the capital crime of which [the defendant] was convicted." (*Lowenfield,* at p. 241.)  Appellant contends *Lowenfield* is inapplicable because the statutory scheme at issue in that case narrowed death-eligible cases at a sentencing phase rather than at the guilt phase.  (See *Bacigalupo, supra,* 6 Cal.4th at pp. 465–466 ["Typically, death penalty statutes satisfy the 'narrowing function' in one of two ways.  [Citation.]  Some states narrowly define capital offenses so that the jury's finding of guilt reflects the 'narrowing function.'  [Citation.]  Other states define capital offenses more broadly and provide for narrowing 'by jury findings of aggravating

16

circumstances at the penalty phase.' "].) Appellant fails to explain why the distinction is a material one here.

In any event, our Supreme Court has squarely held "first degree murder liability and special circumstance findings may be based upon common elements without offending the Eighth Amendment." (*People v. Catlin* (2001) 26 Cal.4th 81, 158; accord, *People v. Johnson* (2016) 62 Cal.4th 600, 636 ["this court's decisions resolving Eighth Amendment challenges to other special circumstance provisions support the conclusion that the amended lying-in-wait special circumstance would satisfy federal constitutional requirements for death eligibility even were the amendment to have made the special circumstance *identical* to lying-in-wait first degree murder"].) We reject appellant's challenge.

VI.    *Unanimity*

The jury was instructed on two theories of first degree murder: premeditation and deliberation, and murder by shooting a firearm from a vehicle. The jury was further instructed they did not have to agree on the same theory of first degree murder.

Appellant argues the failure to instruct the jury that its verdict must be unanimous as to the theory of first degree murder violated his constitutional right to a jury trial. He contends earlier United States Supreme Court and California Supreme Court cases to the contrary have been "[u]ndercut" by *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Ring v. Arizona* (2002) 536 U.S. 584. Our Supreme Court has rejected this argument: " 'As for defendant's claim that a unanimity instruction should have been given, our cases have repeatedly rejected this contention, holding that the jurors need not unanimously agree on a theory of first degree murder as either felony murder or murder with premeditation and deliberation.

17

[Citations.] [¶] We are not persuaded otherwise by *Apprendi v. New Jersey* [(2000)] 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435]. There, the United States Supreme Court found a constitutional requirement that any *fact* that increases the maximum penalty for a crime, other than a prior conviction, must be formally charged, submitted to the fact finder, treated as a criminal element, and proved beyond a reasonable doubt. [Citation.] We see nothing in *Apprendi* that would require a unanimous jury verdict as to the particular *theory* justifying a finding of first degree murder. (See also *Ring v. Arizona* (2002) 536 U.S. 584, 610 [153 L.Ed.2d 556, 122 S.Ct. 2428, 2443–2444] [requiring jury finding beyond reasonable doubt as to *facts* essential to punishment].)' " (*People v. Tully* (2012) 54 Cal.4th 952, 1023–1024.)

We follow our Supreme Court, as we must (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), and reject appellant's challenge.

DISPOSITION

The judgment is affirmed.

SIMONS, J.

WE CONCUR:

JACKSON, P. J.

BURNS, J.

A164600
*People v. Jackson*

19